UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

ROBERT WELLS,

        Plaintiff,

                                       Case No. 10-cv-10543

v.

                                       Paul D. Borman
                                       United States District Judge

CITY OF DEARBORN HEIGHTS, et al.,

                                       R. Steven Whalen
        Defendants.                   United States Magistrate Judge

_____/

## ORDER GRANTING DEFENDANTS' MOTION
## FOR SUMMARY JUDGMENT (Dkt No. 51)

Robert Wells ("Plaintiff") filed the Complaint in this matter on February 9, 2010, alleging various tort claims arising out of his arrest during the execution of a search warrant at his home by the Dearborn Heights Police Department. (Dkt. No. 1.) Defendants are the City of Dearborn Heights (the "City") and police officers Barr, Boljesic, Timothy Ciochon, Dehart, Gonzales, McManmon, Mark Meyers, Mitchell, Patrick Mueller, Nason, Christopher Pellerito, Poshadlo, Donald Riley, Robert Schnell, Corey Smith, and Rodney Smith (collectively, "Defendants"). Plaintiff alleges the following four counts: (1) Excessive force in violation of 42 U.S.C. § 1983; (2) Failure to train/supervise; (3) Assault and battery, and (4) Gross negligence.

Defendants filed the instant Motion for Summary Judgment on September 28, 2011. (Dkt. No. 51.) Plaintiff filed a Response on October 27, 2011. (Dkt. No. 58.) Defendants filed a Reply on November 7, 2011. (Dkt. No. 59.) The Court held a hearing on Monday, December 5, 2011.

For the reasons stated below, the Court will GRANT Defendants' Motion.

1

# I. BACKGROUND

On February 12, 2008, Dearborn Heights police officers, executing a valid search warrant for Plaintiff's residence, discovered marijuana in the home and arrested Plaintiff, along with his father, Randall Wells, and Plaintiff's two siblings, Thomas Wells and Tabatha Wells, who were also in the house. Police officers also recovered $1,932 from Plaintiff's pants pocket. Plaintiff was charged with, and later pled guilty to, possession of a controlled substance.

A raid risk assessment completed by the Dearborn Heights Police Department prior to the February 12, 2008 search warrant execution noted that Plaintiff's criminal history included assault on police. (Defs.' Mot., Ex. 4, Risk Assessment Matrix.)

## A. Plaintiff's Deposition

Plaintiff alleges that he was injured when the Defendant police officers, after forcibly entering his home, forced him to the ground, handcuffed him, shot one of his dogs, and then tasered him in his right hip. At his deposition, Plaintiff stated that the Defendant police officers forcibly entered his home without knocking and announcing their presence:

> Q      Okay. And how did you know that the police were present at the house?
>
> A      What? The way they come in.
>
> Q      Okay. What did you hear?
>
> A      Well, they opened the front door, you know, it's like guarded [sic] door with, you know, bars on it. They opened that up real nicely and bam, through the door.

(Defs.' Mot., Ex. 1, Robert Wells Dep. 156.)

Plaintiff stated that the front door opened to the living room area of the house, where Plaintiff

2

and his father were sitting when the Defendant police officers entered the home. Plaintiff testified

that the Defendant officers, after breaking down the front door, immediately entered the home with

guns drawn and demanded that Plaintiff and his father get down on the ground. Plaintiff further

testified that both he and his father immediately complied, but because he has cerebral palsy,

Plaintiff was moving slowly. Plaintiff alleges that while he was getting down, one of the Defendant

officers kneed him in the back, knocking him to the ground, and then handcuffed him. Plaintiff

stated that only a few seconds passed between the time the police entered the home and the time

Plaintiff was pushed to the ground and handcuffed.

Plaintiff testified that after he was on the ground and handcuffed, he heard a gunshot. He

then turned his head to the right, where his father, Randall, was laying, because he believed his father

had been shot. Randall told Plaintiff that he was fine, but that an officer had shot Plaintiff's dog.

Plaintiff testified that he then attempted to turn over, but was tasered before he was able to get off

of his stomach.

| | | |
|---|---|---|
| Q | You were originally facing left when you were on your stomach, right? | |
| A | Yeah. | |
| Q | You heard the gunshot, you turned your head to the right, correct? | |
| A | Yeah. | |
| Q | Okay. Then, you have that conversation where your dad says, it's not me it's the dog. Is that when you start to roll over? | |
| A | What? No. I turned my head, I said you shot my fucking dad, you pig. And dad is like, no, no, they shot the dog.<br>    When my dad said that, that's when I turned my head around like that and when I was turning around to get on my | |

3

back, they boom, hit me with the taser, handcuffed.

Q       Okay.

A       Okay.  End of discussion.

Q       When you turned back to the left, you said you turned around.
        How far around did you get before you got tasered?

A       What?  I got, I was still on my stomach.

(Robert Wells Dep. 193-94.)

Plaintiff specified that the taser probes entered his body on the side of his right hip.

Q       Okay.  And where are the pictures on your body, the two
        different locations where the probes entered your body?

A       Right, boom, right here on the right side of my hip right here,
        boom.

Q       Okay.  Both are on your right hip?

A       Yep.

( . . . . )

Q       And you're pointing to the outside of your right hip?  In other
        words, the, the, geez, I'm not a doctor but the area of your hip that
        points furthest away from your body?  In other words, the
        very side of your hip?

A       Yeah, yeah, very side of it.

Q       Okay.  Not your buttocks?

A       No.

Q       And not the front?

Q       That's right, yeah.  Right there, boom.  Just right there on the
        hip. . . .

4

(Robert Wells Dep. 236-37.)

**B. Defendants' Depositions**

Defendant Mueller was the first officer to enter the home during the February 12, 2008 search and seizure operation, followed by officers Pellerito and Ciochon. Defendant Mueller testified that two dogs were at the threshold of the home, barking and growling, before he entered, and that he shot one of the dogs because it was attempting to bite his leg. (Defs.' Mot., Ex. 5, Mueller Dep. 32.)

After shooting the dog, Defendant Mueller stated that Plaintiff began approaching him and would not comply with any verbal commands to get down.

> Q    Okay. Robert is yelling at you, you just said, because he was upset because you shot his dog?
>
> A    Yes.
>
> Q    What happens next?
>
> A    I kept telling him to get down, and he approached me. I held out my arm.
>
> ( . . . . )
>
> Q    I'm sorry. What happened next after you told him to get down?
>
> A    Well, I held out my arm to keep my distance from him, and he swatted my arm away.
>
> ( . . . . )
>
> Q    And after Robert swatted your arm, as you say, what happened next?
>
> A    I did a push kick on him.
>
> Q    Can you explain that at all for me?

5

A     Just basically pushed him back with my, you know, foot to his midsection area.

Q     Your foot to his midsection area?

A     Yeah.

Q     Stomach?

A     Probably thigh area. I don't think I kicked as high as his stomach, but in that area.

Q     Was it one kick or how many?

A     I think I ultimately did two kicks. The first one just pushed him back, and he came back at me, and then on the second one he sort of just went to the ground right there.

(Mueller Dep. 36, 38.)

Defendant Mueller stated that after Plaintiff fell, he kicked Defendant Mueller and then attempted to get up again. Defendant Mueller further testified that he used a taser on Plaintiff before Plaintiff was handcuffed, and that the prongs struck Plaintiff in his abdomen.

Q     While he was trying to get back up he was also kicking at your legs?

A     Well, he fell down, kicked at me, and then he tried to get back up.

Q     Can you describe how he kicked at you?

A     From the ground he kicked my legs.

Q     Did he make actual contact with your legs?

A     Yes.

Q     Were you injured at all?

A     No.

Q       So he kicked at your legs.  Was it a one-time kick?

A       I think so.

Q       Then what happened next?

A       Well, then I deployed a taser on him.

( . . . . )

Q       So, he was still on his backside, meaning he wasn't on this [sic] stomach at all at that point, as you recall?

A       Correct.

Q       Where did you tase Robert?

A       In the abdomen part.

( . . . . )

Q       What happened next?

A       I then ultimately ended up removing the probes, and eventually he was cuffed.

(Mueller Dep. 40-42.)

Defendant Mueller's recollection is substantially similar to the recollection of Defendant officers Pellerito and Ciochon.  (Defs.' Mot., Exs. 6 and 21.)

## C. Contradictory Evidence and Testimony

Plaintiff's deposition testimony is somewhat contradicted by other evidence in the record. Most notably, a February 13, 2008 television news segment involving the incident purportedly shows that the taser probes wounded Plaintiff in his lower right abdomen, not his right hip, as he repeatedly stated during his deposition.

Plaintiff's version of the facts is also contradicted by other evidence in the record.

7

Plaintiff stated that he did not have a seizure at any time during the incident with the police. (Robert Wells Dep. 240.) Plaintiff's brother, Thomas Wells, testified that Plaintiff was having a seizure as he was being handcuffed and tasered. (Defs.' Mot., Ex. 18, Thomas Wells Dep. 64.)

## II. LEGAL STANDARD

Defendants have moved for summary judgment pursuant to Federal Rule of Civil Procedure 56(c). This rule provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." The Court must, however, view the evidence and draw all reasonable inferences in favor of the party opposing summary judgment. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 547, 587 (1986). Still, "the mere existence of a colorable factual dispute will not defeat a properly supported motion for summary judgment. A genuine dispute between the parties on an issue of material fact must exist to render summary judgment inappropriate." *Monette v. Electronic Data Systems Corp.*, 90 F.3d 1173, 1177 (6th Cir. 1996).

The moving party bears the initial burden of showing that there is no genuine issue of material fact. *Matsushita*, 475 U.S. at 587. Once this burden is met, the opposing party must produce some facts showing there is a genuine issue for trial. *Id.* The Court does not determine if all of the evidence favors one side or the other, but "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

## III. ANALYSIS

As an initial matter, the Court notes that Plaintiff has abandoned his claims against Defendant

8

Officers Barr, Boljesic, Dehart, Gonzales, McManmon, Meyers, Mitchell, Nason, Poshadlo, Riley, Schnell, Corey Smith, and Rodney Smith. (Pl.'s Resp. 10 n.1.) Accordingly, all claims against these Defendants will be dismissed with prejudice. The remaining Defendants are Officers Mueller, Ciochon, and Pellerito, and the City of Dearborn Heights.

## A. Video Evidence

Defendants argue that the Court should not adopt Plaintiff's version of the facts for purposes of the instant Rule 56(c) motion, because Plaintiff's version of the events is contradicted by the video from the local news broadcast. Defendants rely on *Scott v. Harris*, 550 U.S. 372 (2007), which held as follows: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380.

*Scott* involved a § 1983 action arising out of injuries that the respondent/plaintiff suffered during a high-speed police chase. The respondent/plaintiff claimed that he was driving carefully, was in control of his vehicle, and was not endangering any pedestrians. *Id.* at 378. However, the Supreme Court noted that a video of the respondent/plaintiff's driving during the high speed chase contradicted his version of the facts.

> There we see respondent's vehicle racing down narrow, two-lane roads in the dead of night at speeds that are shockingly fast. We see it swerve around more than a dozen other cars, cross the double-yellow line, and force cars traveling in both directions to their respective shoulders to avoid being hit. We see it run multiple red lights and travel for considerable periods of time in the occasional center left-turn-only lane, chased by numerous police cars forced to engage in the same hazardous maneuvers just to keep up.

*Id.* at 379-80 (footnote omitted). In finding that the respondent/plaintiff's version of the facts was

blatantly contradicted by the video evidence, the Supreme Court found that the videotape "captur[ed] the events in question[,]" and that there were "no allegations or indications that [the] videotape was doctored or altered in any way . . . ." *Id.* at 378.

The Sixth Circuit has noted that, under *Scott,* a district court may consider video evidence on summary judgment, but must still view "the events depicted in the video . . . in the light most favorable to" the non-moving party. *Dunn v. Matatall,* 549 F.3d 348, 353 (6th Cir. 2008). Moreover, the Sixth Circuit has applied *Scott* narrowly. *See Coble v. City of White House, Tenn.,* 634 F.3d 865, 870 (6th Cir. 2011) (finding that grant of qualified immunity was erroneous where an audio recording "blatantly contradicted" the plaintiff's testimony, but did not necessarily "discredit his entire version of the events.").

Viewed in a light most favorable to Plaintiff, the video in the instant case does not blatantly contradict, nor entirely discredit, Plaintiff's version of the events. First, unlike the video in *Scott,* which depicted the actual police chase at issue, the video in the instant case is a news report that does not depict any of Plaintiff's or Defendants' actions during the narcotics search and seizure. Also unlike the video in *Scott,* which was not doctored or altered, the instant video is a television news report replete with edits and voice over from the reporter explaining the images being displayed. Defendants contend that Plaintiff's claims that he was tasered in his hip are contradicted by the video, which purports to show Plaintiff's taser wounds on his lower right abdomen. However, it is the reporter – not Plaintiff – explaining that the wounds depicted in the video are from the taser, which could have been an error. Further, the video includes a statement by Randall Wells that Plaintiff was tasered in his hip, and thus does not contradict Plaintiff's version of the events. Accordingly, the video evidence does not provide a basis for the Court to discredit Plaintiff's version

of the facts on summary judgment.

Defendants argue that Plaintiff's version of the facts cannot be relied on because it is contradicted by other evidence in the record. But the Court cannot weigh the evidence on a motion for summary judgment, "even when the nonmovant's account is contradictory." *Schreiber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010). "We allow cases to proceed to trial even though a party's evidence is inconsistent . . . ." *Coble*, 634 F.3d at 870. These inconsistencies are issues of weight and credibility, which are for the trier of fact.

Defendants further argue that Plaintiff has failed to produce photographic evidence of his wounds, which he claimed he had during his deposition. (Robert Wells Dep. 236.) Defendants assert that the missing photographs should lead to an adverse inference against Plaintiff's version of the events.

This issue has been before the Magistrate Judge, who noted that "Plaintiff cannot produce what he does not have." (Defs.' Mot., Ex. 10, Magistrate Judge Order 1.) The Magistrate Judge directed Plaintiff to conduct a diligent, good-faith search for the pictures. If Defendants believe that Plaintiff has failed to do so, they should set forth their reasons for so believing in a motion for evidentiary sanctions. However, the Court will not draw a negative inference against Plaintiff absent any evidence that Plaintiff failed to comply with the Magistrate Judge's Order.

## B. Qualified Immunity

The doctrine of qualified immunity protects government officials from civil liability unless, "in the course of performing their discretionary functions, they violate the plaintiff's clearly established constitutional rights." *Jones v. Byrnes*, 585 F.3d 971, 974 (6th Cir. 2009). There are two relevant inquiries in determining whether a defendant is entitled to qualified immunity: (1) "whether

11

viewed in the light most favorable to plaintiff, the facts show that the officer's conduct violated a constitutional right[,]" and (2) "whether the constitutional right was 'clearly established' at the time of the violation." *Id.* at 975. "A right is 'clearly established' if the contours of the right are sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Schreiber*, 596 F.3d at 329 (citation omitted). A police officer's use of force is analyzed for "objective reasonableness." *Graham v. Connor*, 490 U.S. 386, 388 (1989)

*1. Defendant Officer Mueller*

Plaintiff argues that Defendant Mueller is liable for excessive force because he tasered Plaintiff even though he was not resisting arrest. Plaintiff argues that force does not have to extend for an ongoing period of time to be considered excessive, citing *Roberts v. Manigold*, 240 Fed. Appx. 675 (6th Cir. 2007). In *Roberts*, the Sixth Circuit found excessive force where an individual was completely pinned to the ground by one officer while another officer "repeatedly used her taser" on the individual. *Id.* at 676.

Even taking the evidence in a light most favorable to Plaintiff, Defendant Mueller is entitled to qualified immunity. Plaintiff admits that after he was handcuffed, he was shouting "you pig" or "you fucking pig," and was attempting to turn around onto his back. Thus, by Plaintiff's own admission, he was not complying with the officers' orders to stop struggling and remain on the ground. Moreover, Defendant Mueller's response was not excessive force. Plaintiff does not dispute that, unlike the defendant in *Roberts*, *supra*, Defendant Mueller expended only one taser cartridge. The Court also finds significant Plaintiff's prior history of assaulting a police officer, of which Defendants were aware based on the risk assessment, and the fact that the events occurred within a few seconds time. "The calculus of reasonableness must embody allowance for the fact that police

12

officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-67.

In addition, Defendant Mueller's use of force in throwing Plaintiff to the ground by kneeing him in the back was not unreasonable. Given Plaintiff's criminal history, it was reasonable for Defendant Mueller to suspect that Plaintiff was not complying with verbal commands when he appeared to be kneeling very slowly, or that Plaintiff may have a weapon hidden near the area where he was kneeling. *See Dunn*, 549 F.3d at 354 (finding officers' actions reasonable where plaintiff "appeared recalcitrant in complying with the Officers' commands to exit his vehicle[,]" and noting that a reasonable officer would "be apprehensive that [the plaintiff] may have a weapon in the car, that the passenger may have a weapon, or that the car may be used as a weapon."). Because Defendant Mueller acted reasonably under the circumstances, he is entitled to qualified immunity.

## 2. Defendant Officers Ciochon and Pellerito

Plaintiff asserts that Defendants Ciochon and Pellerito are liable for failing to stop Defendant Mueller's use of force, relying on *Bruner v. Dunaway*, 684 F.2d 422 (6th Cir. 1982), which held that "it is not necessary, in order to hold a police officer liable under § 1983, to demonstrate that the officer actively participated in striking a plaintiff." *Id*. at 426.

*Bruner* does not provide a basis for § 1983 liability for the Defendants in this case. In *Bruner*, the plaintiff claimed that he was repeatedly struck and dragged down an alley by several police officers. *Id*. at 424. three police officers testified that they did not participate in subduing the plaintiff, but that they were at the scene when it occurred. *Id*. The Sixth Circuit found that these three police officers could be liable under § 1983 for acts of omission. *Id*. 426.

13

In the instant case, Plaintiff admits that the events occurred rapidly, and he does not claim any ongoing excessive force, like repeated tasering or beating. Therefore, even assuming that Defendant Mueller's actions constituted excessive force, if they occurred as quickly as Plaintiff states they did, Defendants Ciochon and Pellerito could not have done anything to prevent the commission of the acts. Accordingly, Defendants Ciochon and Pellerito cannot be liable for acts of omission under *Bruner*, and are thus entitled to qualified immunity.

## C. State Law Claims for Assault and Battery and Gross Negligence

Plaintiff alleges that Defendant Mueller is liable for assault and battery. Under Michigan law, "a police officer may use reasonable force when making an arrest." *Brewer v. Perrin*, 132 Mich. App. 520, 528 (1984). "The force reasonably necessary to make an arrest is 'the measure of necessary force that an ordinarily prudent and intelligent person, with the knowledge and in the situation of the arresting officer, would have deemed necessary.'" *VanVorous v. Burmeister*, 262 Mich. App. 467, 481 (2004) (citing *Brewer*, 520 Mich. App. at 528) (punctuation omitted).

As discussed *supra* at Part B, Defendant Mueller's actions were objectively reasonable under the circumstances. Accordingly, Plaintiff's claim for assault and battery are dismissed.

Plaintiff also argues that Defendants Mueller, Ciochon and Pellerito are all liable for gross negligence. "Under the governmental immunity act, a governmental employee is not liable in tort for personal injuries as long as the employee's 'conduct does not amount to gross negligence that is the proximate cause of the injury or damage.'" *Oliver v. Smith*, 269 Mich. App. 560, 565 (2006) (citing Mich. Comp. Laws § 691.1407(2)(c)). Conduct is considered grossly negligent if it is "so reckless as to demonstrate a substantial lack of concern for whether an injury results." Mich. Comp. Laws § 691.1407(7)(a).

14

> Police officers, especially when faced with a potentially dangerous
> situation, must be given a wide degree of discretion in determining
> what type of action will best ensure the safety of the individuals
> involved and the general public, the cessation of unlawful conduct,
> and the apprehension of wrongdoers. The determination of what type
> of action to take, e.g., make an immediate arrest, pursue a suspect,
> issue a warning, await backup assistance, etc., is a discretionary-
> decisional act entitled to immunity. Once that decision has been
> made, however, the execution thereof must be performed in a proper
> manner, e.g., the arrest must be made without excessive force, the
> pursuit of the suspect must not be done negligently, the request for
> assistance must include reasonably accurate information, etc.

*Ross v. Consumers Power Co.*, 420 Mich. 567, 659-60 (1984).

Defendant Mueller was not negligent in the execution of Plaintiff's arrest. As noted *supra*, taking into account the surrounding circumstances, the force used by Defendant Mueller was reasonable and not excessive.

Likewise, Defendants Ciochon and Pellerito acted reasonably. Even if discharging one taser charge was excessive force, Plaintiff admits that the events occurred within a few seconds, and Defendants Ciochon and Pellerito would not have had time to sufficiently react.

Plaintiff's claims for gross negligence are therefore be dismissed.

## D. Claims Against the City of Dearborn Heights

Plaintiff argues that the City is liable for failure to adequately train and supervise its police officers. However, because the Court has found that none of the individual Defendants violated Plaintiff's constitutional rights, Plaintiff cannot maintain his municipal liability claims. *See Miller v. Sanilac County*, 606 F.3d 240, 254-55 (6th Cir. 2010) ("To succeed on a municipal liability claim, a plaintiff must establish *that his or her constitutional rights were violated* and that a policy or custom of the municipality was the 'moving force' behind the deprivation of the plaintiff's rights."

15

(emphasis added)).  Plaintiff's claims against the City of Dearborn Heights are therefore dismissed.

### IV.  CONCLUSION

For the reasons stated above, the Court will **GRANT** Defendants' Motion for Summary Judgment and **DISMISS** the action **WITH PREJUDICE**.

**SO ORDERED.**

_____
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated:  12-22-12